IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ST. CLAIR COUNTY, ILLINOIS, AND )
MACON COUNTY, ILLINOIS, )
INDIVIDUALLY AND ON BEHALF OF )
ALL OTHER COUNTIES IN THE STATE )
OF ILLINOIS, )
)
    PLAINTIFFS, )
) CIVIL ACTION NO.: 3:14-cv-1320
vs. )
) JURY TRIAL DEMANDED
TRINITY INDUSTRIES, INC. and )
TRINITY HIGHWAY PRODUCTS, LLC, )
)
    DEFENDANTS. )

## FIRST AMENDED CLASS ACTION COMPLAINT

Come Now the Plaintiffs, St. Clair County, Illinois, and Macon County, Illinois, by their undersigned counsel and through their designated representatives, Brendan Kelly, State's Attorney for St. Clair County, Illinois and Jay Scott, State's Attorney for Macon County, and for their Complaint against Trinity Industries, Inc. and Trinity Highway Products, LLC (collectively "Trinity" or "Defendants"), allege and state upon information and belief as follows:

## INTRODUCTION

1.    This action seeks to redress economic harm to Plaintiffs, St. Clair County, Illinois and Macon County, Illinois ("the Counties") and all other counties in the State of Illinois caused by Trinity relating to its sale of an unsafe and unapproved guardrail end treatment that has been sold and installed as a safety device on the roads and highways of the counties in the State of Illinois.

2.    Trinity is in the business of designing and building guardrails and guardrail components that are sold to governmental bodies. The product at issue in this case was originally

1

designed as the ET-2000 and after certain modifications was renamed the ET-Plus. Both were extensively marketed, sold and installed by the Trinity defendants. Both the ET-2000 and the ET-Plus have received approval letters from various state and federal agencies as being eligible for reimbursement because of the ET-2000 and ET-Plus compliance with minimum safety standards and design specifications. Thousands of these units have been paid for, at least in part, by the Counties and other counties in the State of Illinois and installed on Illinois highways and roads.

3.     Without the knowledge or approval of the counties of the State of Illinois, Trinity made a series of modifications to the design and specifications of the ET-Plus. These modifications were made in the early to mid 2000s, specifically 2002 and 2005. Trinity failed to properly test units that contained these unilateral changes. Instead of undertaking proper testing and seeking approval, Trinity has falsely certified that the modified ET-Plus is certified for use based on federal testing standards and approved for reimbursement when approval has never been sought or granted for the modified unit.

4.     The changes for the ET-Plus are not harmless.  As addressed below, when a vehicle strikes the modified ET-Plus, the modified internal dimensions of the ET-Plus can cause the guardrail to lock in the throat of the unit, thereby causing the unit to malfunction, creating a hazard to the occupants of the vehicle and others. Several recent accidents involving the modified ET-Plus units have resulted in serious injuries and fatalities when the ET-Plus units malfunctioned. These design defects were not present in the previous iterations of the ET-Plus systems nor were the unilateral changes ever approved by the State of Illinois or any agency thereof.

## PARTIES

5.     Plaintiff St. Clair County, Illinois ("St. Clair County") is "a body politic and corporate" for the purposes of bringing or defending suit. Brendan Kelly, as the State's Attorney for

2

St. Clair County, is authorized to prosecute civil actions such as this one on behalf of St. Clair County.

6.     Plaintiff Macon County, Illinois ("Macon County") is "a body politic and corporate" for the purposes of bringing or defending suit. Jay Scott, as the State's Attorney for Macon County, is authorized to prosecute civil actions such as this one on behalf of Macon County. (Collectively St. Clair County and Macon County are referred to herein as "the Counties" or "Plaintiffs".)

7.     Defendant Trinity Industries, Inc. is a Delaware corporation authorized to do business in Illinois. Its principal place of business is located at 2525 N. Stemmons Freeway, Dallas, Texas 75207. Trinity Industries, Inc.'s Illinois agent for service of process is CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

8.     Defendant Trinity Highway Products, LLC is, on information and belief, a Delaware limited liability company with its principal place of business at 2525 N. Stemmons Freeway, Dallas, Texas 75207. Pursuant to the Illinois Secretary of State, Trinity Highway Products LLC's is an assumed name for Energy Absorption Systems, Inc. and its Illinois agent for service of process is CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL  60604.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and members of the Class are citizens of a state different from the Defendants.

10.     This Court has jurisdiction over the Defendants because a majority of the wrongdoing alleged in this Complaint took place in the State of Illinois, and this Complaint seeks

redress arising from Defendants' faulty and non-compliant product installed in Illinois counties and because Defendants are authorized to do business in the State of Illinois.

11.     Venue is proper in this District, pursuant to 28 U.S.C. §1391, because the acts upon which this action is based occurred, in part, in this District in that Trinity manufactures, sells and has sold guardrail systems that were installed throughout St. Clair County and Macon County, as well as throughout the State of Illinois. Further, Trinity understands that its guardrail systems are placed in the stream of commerce to be utilized in various jurisdictions, such as this one.

## FACTS

12.     Trinity is in the business of manufacturing various highway safety and construction products. In particular, Trinity manufactures the ET-Plus guardrail end terminal ("ET-Plus") under an exclusive license agreement from Texas A&M University. The ET-Plus is commonly referred to as a "head" and when used in conjunction with the standard "W beam" style guardrail seen throughout the roads and highways of America is designed to absorb and dissipate the energy of a vehicular impact.  Upon impact, the guardrail is extruded through the head and flattened out into a ribbon, thus absorbing the majority of the errant vehicle's energy without severe impact forces that would result in life threatening injuries.

13.     Texas A&M University ("TAMUS") is the owner of certain patents that are embodied in the ET-Plus guardrail terminal system.  TAMUS granted Trinity an exclusive license to sell the ET-Plus.

14.     The original design of the subject product was a guardrail end named ET-2000. The ET-2000 was subsequently modified and renamed the ET-Plus. The ET-Plus, as originally designed, was approximately 80 pounds lighter than the ET-2000 and was originally approved in

January, 2000 by the Federal Highway Administration ("FHWA").  The original production of the ET-Plus was initially built according to the design and specifications approved by FHWA. That version of the ET-Plus was overall very successful.

15.   The following pictures show the first model ET-Plus performing correctly:





16.     Between 2002 and 2005, Trinity secretly modified certain critical dimensions of the ET-Plus. As addressed below, Trinity was required to, but did not, inform FHWA of these changes, and the secretly redesigned product has never received the approvals necessary to install it on the highways of any state in the union.  Despite the lack of approval, thousands of the secretly redesigned ET-Plus end terminals have been installed across the United States and in over 60 foreign countries. The secretly redesigned and unapproved ET-Plus terminals are illegal and, moreover, fail at an alarming rate, thereby killing or maiming citizens of the United States of America, including by impaling drivers and passengers with the very guardrails that were originally intended to protect them.

## TRINITY'S SECRET PRODUCT MODIFICATIONS

17.     When Trinity obtained regulatory approval of the original ET-Plus in 2000, it was required to provide FHWA and the state Departments of Transportation with scaled drawings that showed the critical dimensions of the product. Those drawings, which whistleblower Joshua Harman[1] confirmed through measurements of the physical product itself, show the following critical dimensions:

|  | **2000** |
|---|---|
| Exit Gate | 1.3 inches to 1.5 inches (usually 1.5) |
| Feeder Channel Width | 5 inches |
| Feeder Chute Height |  |
|    a. exterior | 15 3/8 inches |
|    b. interior | 15 3/8 inches |
| Feeder Chute Assembly Length | 37 inches |

---

[1] Joshua Harman was the whistleblower who made the violations committed by Trinity public.  *See United States of America ex rel Joshua Harman v. Trinity Ind. Inc.*, 2:12-cv-0089-JRG (E.D. Tex.), which resulted in a jury verdict of $175,000,000.00 on October 20, 2014 pursuant to the False Claims Act. *Id.* at Dkt. No 570. Upon information and belief, the jury in the Harman case rejected the arguments and claims set forth on p. 1-17 of Defendants' Motion to Dismiss in the instant matter  (Dkt. No. 33).

Between 2002 and 2005, Trinity secretly changed each of the critical dimensions set forth above. Based on measurement of numerous ET-Plus units, the new dimensions are:[2]

|  | Summer of 2005 |
|---|---|
| Exit Gate | 1.0 inches |
| Feeder Channel Width | 4 inches |
| Feeder Chute Assembly Height<br>        a.  exterior<br>        b.  interior | <br>14 7/8 inches<br>14 3/8 inches |
| Feeder Chute Assembly Length | 36 ¼ inches |

18.     Although required to do so, Trinity never sought approval for the secretly redesigned ET-Plus or provided scaled drawings of the modified unit to the FHWA. To date, Trinity has only provided to the FHWA one drawing of a purportedly redesigned unit that shows a four inch feeder channel; however, that drawing lacks the detail necessary for it to be effectively used and is not scalable as required by FHWA policies.

19.     The problem with the ET-Plus as modified in 2005 is that the guardrail does not feed properly through the chute due to the reduced area/dimensions of the feeder chute itself.  This causes the guardrail to "throat lock" in the head during impact. Once throat locked, the energy of the crash is diverted elsewhere usually causing the guardrail to double over on itself or protrude through the crashing vehicle.

20.     Based on the information and testimony that was made available in certain patent litigation filed in the Eastern District of Virginia as well as whistleblower Harman's investigation, the following timeline regarding the modifications to the ET-Plus have become known.

21.     Sometime between January and May 2005, Steve Brown (then president of Trinity Highway Products) asked Wade Malizia (then manager of Trinity plant 31 in Girard, Ohio) to

---

[2] Based on whistleblower Harman's measurement of various ET-Plus units, there may be slight variations in the dimensions of the post-modified ET-Plus; the point is, however, these units all have critical dimensions that are *smaller* than the ET-Plus unit that was tested and approved and these smaller dimensions cause the product to malfunction as more fully described herein.

make an ET-Plus prototype using 4-inch wide feeder channels. Mr. Malizia in turn delegated the task to the plant 31 welding shop. The welders attached 4-inch wide feeder channels to the standard extruder throat unit that Trinity had used since approval in January 2000. No engineer was involved in the process to assure that the critical dimensions of the original tested product were maintained.

22.     Trinity shipped the prototype to the Texas A&M Transportation Institute in April or May 2005. As discussed in greater detail below, this prototype was not treated as either a new unit or as a modification of an existing unit. The modifications were not disclosed to the FHWA. Moreover, the prototype was not fully tested pursuant to National Cooperative Highway Research Program Report 350 ("NCHRP 350"), and the modifications were not disclosed pursuant to FHWA's protocols.

23.     Trinity did not comply with even one requirement for a new or modified unit. In July 2005, Trinity made a submission to the FHWA specifying eight (8) changes that were made to the ET-Plus system. However, not one change to the internal or external dimensions of the extruder head was revealed in that submission.

24.     In 2005, Trinity began shipping to customers ET-Plus units that were significantly different than the unit that received federal approval.

25.     In addition to the change to the width of the feeder channels from 5 to 4 inches, Trinity made, *inter alia*, the following additional changes: According to a drawing of the Feeder Chute Assembly created on May 31, 2005, Trinity inserted the channels approximately 3/4 inch into the extruder throat which had the effect of reducing the height of the Feeder Chute Assembly by approximately 3/8 inches because of the thickness of the metal of the Feeder Channel. In making this change Trinity also changed the type of weld used to connect two critical pieces of

the unit. The original weld resulted in a flush fit; the new weld caused the thickness of the metal of the channel to intrude into the roof and floor space of the extruder chamber.  Trinity also reduced the height of the Feeder Chute Assembly by an additional 1/8 inch. The effect of these changes on the exterior dimensions had an even more pronounced effect on the internal dimensions because the steel feeder channels are parallel and by inserting them into the tapered roof and floor, they lost the benefit of the widest part of the tapered roof and floor. Ultimately, these changes resulted in a 1 inch reduction of the internal height of the extruder channel. On July 6, 2005, Trinity shortened the length of the Feeder Chute Assembly by 3/4 inch in an attempt to reduce scrap that resulted from production and reduce costs.

26.     On information and belief, the 2005 changes to the ET-Plus, including the changes to the dimensions of the unit, as well as the type of weld used to build the unit, reduced Trinity's costs to manufacture the ET-Plus.  Moreover, after an accident, the most expensive part of the ET-Plus, the Extruder Head, could often be re-used on the unit as originally designed. After Trinity's unreported changes to the ET-Plus in 2005, and on information and belief, the heads cannot be re-used as regularly or easily after an accident, thereby requiring the federal and/or state highway authorities/entities to purchase new ET-Plus units as replacements.

### FHWA REGULATION OF THE ET-PLUS

27.     The ET-Plus, along with other products used on the National Highway System, must undergo rigorous testing to determine crashworthiness before the product may be placed on the National Highway System. The FHWA, a division of the Department of Transportation, is charged along with other state and federal agencies with establishing the crashworthiness criteria for products such as the ET-Plus.  Between 1998 and 2010, new highway safety features were

required to be tested according to the NCHRP 350.[3] NCHRP 350 provides detailed requirements regarding almost every parameter of the required tests including, *inter alia*, how the tests are to be performed, requirements for test vehicles, test conditions, and the data to be collected.

28.     Not only are the required tests strictly regimented, the materials that must be submitted for approval are also expressly defined by the FHWA. Submissions that a highway feature is crashworthy and acceptable for use on the National Highway System: "must fully identify: a) the feature(s) tested; b) the conditions and results of the testing; and, if acceptance is being sought for any variation in design or construction details or procedures from those covered in the documentation of the testing of the feature; c) the complete design, construction, and installation details and specifications for the version(s) of the feature for which acceptance is being sought.[4] FHWA also explicitly requires two copies of a "high quality, reproducible, letter-size, engineering drawing or set of drawings showing all pertinent details and installation requirements of the version(s) of the feature for which acceptance is being sought are to be included with the request for acceptance." *Id*.

29.     Once a product is approved for use on the highways, its design specifications cannot be altered without additional testing and approval, which must be granted prior to the modified product being used on the National Highway System.  The FHWA has established three categories of changes for equipment that already has FHWA approval and a specific means to demonstrate that the new hardware is acceptable: (1) Significant modifications require additional testing pursuant to NCHRP 350 or MASH standards; (2) Non-Significant modifications where the "Effect

---

[3] After January 1, 2011 new highway safety features were evaluated according to the American Association of State Highway and Transportation Officials' Manual for Assessing Safety Hardware ("MASH"); however, equipment that had previously been approved pursuant to NCHRP was not required to be retested and certified.

[4] Background and Guidance on Requesting Federal Highway Administration Acceptance of Highway Safety Feature attached to FHWA's Policy Memo: Identifying Acceptable Highway Safety Features available at http://www.fhwa.dot.gov/legsregs/directives/policy/ra.htm

is Uncertain" require finite element analysis acceptable under NCHRP 179 and validation of that analysis; and (3) Non-significant modifications where the "Effect is Positive or Inconsequential" require a certification by a registered professional engineer that the change has no adverse effect on crash test performance as well as an engineering report of the original crash testing and the expected effects of the modifications.  See FHWA policy:  Federal Aid Reimbursement Eligibility Process                                             available                                             at http://safety.fhwa.dot.gov/roadway_dept/policy_guide/road_hardware/acceptprocess/#s2b.

30.    To ensure compliance with its requirements, FHWA's policy is to revoke acceptance if misrepresentations are made by the developer:  "Any deliberate misrepresentation or withholding of the conditions of  FHWA's acceptance of a feature by the supplier of a feature will be cause for withdrawal of acceptance."   Background and Guidance on Requesting Federal Highway Administration Acceptance of Highway Safety Features.

http://www.fhwa.dot.gov/legsregs/directives/policy/ra.htm

### TRINITY'S FRAUD ON FHWA, THE COUNTIES AND THE PUBLIC

31.    As addressed above, FHWA regulations require that a manufacturer of highway safety products sell the same product as that for which approval was sought and granted. Any modification, even one expected to have a positive effect on the product, requires additional submissions to the FHWA. Trinity's modifications, however, not only remain unsubmitted, but do not have a positive effect on the ET-Plus. Instead, those changes are significant and would have, if disclosed by Trinity, required additional testing pursuant to NCHRP 350 standards.  Trinity did not perform that testing and fraudulently concealed the series of modifications it made on the ET-Plus.[5]

---

[5] Trinity also did not seek approval for any variations of design that would have required Trinity to submit "complete design, construction, and installation details and specifications for the version(s) of the feature for which acceptance is being sought."  Background and Guidance on Requesting Federal Highway Administration Acceptance of Highway Safety Feature, *supra*.

32.     Manufacturers, such as Trinity, are not merely required to sell the same product as that for which approval was granted, they are also required to certify this fact to buyers. The FHWA standard approval letter states that the following provision applies:

> You will be expected to certify to potential users that the hardware furnished has essentially the same chemistry, mechanical properties, and geometry as that submitted for acceptance.

Trinity received this very language in FHWA's March 15, 2010 approval letter CC-12Q in response to a separate modification to the ET-Plus for which it sought approval. In selling the ET-Plus after the secret modifications, Trinity has provided false certifications that its units are the same as those approved by the FHWA.

33.     After the existence and sale of the unapproved version was brought to the FHWA's attention by Mr. Harman in January 2012, Trinity scheduled a meeting with Mr. Nicholas Artimovich of FHWA's Office of Engineering. At that February 14, 2012 meeting, Trinity admitted for the first time that they had, indeed, shrunk the width of the ET-Plus' feeder channels from 5 inches to 4 inches; however, they failed to tell Mr. Artimovich that they had also shrunk the interior vertical clearance of the feeder chute by approximately 1 inch. They further failed to tell Mr. Artimovich that they had also shrunk the ET-Plus' exit gate by approximately one half inch resulting in a 33% decrease. Not surprisingly, Trinity did not give Mr. Artimovich scaled drawings of the secretly changed ET-Plus. The drawings would have shown the extensive, additional changes.

34.     In the February 14, 2012 meeting with Mr. Artimovich, and focusing solely on the change to the 4 inch feeder chute, Trinity requested that the secretly changed ET-Plus was tested successfully on May 27, 2005. On February 28, 2012, Brian Smith submitted to the FHWA the test results purportedly corresponding to the May 27, 2005 test along with other materials to perpetuate the falsehood that the unit tested and approved was the same as the unit Trinity had sold

for the previous seven years.  In reliance on Trinity's and TAMUS' continuing misrepresentations, the FHWA has continued to approve the use of the ET-Plus on the National Highway System and continued to permit that unit to qualify for Federal reimbursement.

35.     Trinity's representation to FHWA that the modified ET-Plus unit was properly tested on May 27, 2005 was itself a blatant misrepresentation for several reasons.  First, the 4-inch prototype purportedly tested on that date was a one-off unit built by Trinity's welders without guidance or supervision of any designer or engineer and without a plan or drawing of what the welders should build or what they did build. Second, even assuming the unit tested on May 27, 2005 had 4 inch wide feeder channels as claimed, Trinity made substantial changes to the design of the modified ET-Plus *after* the May 27, 2005 test, such that the versions Trinity began selling in the fourth quarter of 2005 necessarily had different specifications and geometry than the unit that was crash tested. Third, the May 27, 2005 test was not designed to see if the modified ET-Plus could properly withstand vehicle impact. Instead, that test was designed to establish that the ET-Plus would work in conjunction with a 31 inch high guardrail system.

## **TRINITY'S FRAUDULENT COVER UP**

36.     After TAMUS and Trinity sued Harman's companies for infringement of the ET-Plus patents, Harman began investigating the ET-Plus. Over time, he discovered the secret, unapproved changes that TAMUS and/or Trinity had made. Mr. Artimovich confirmed in a deposition in the patent case that he was unaware of the multiple secret changes Trinity had made to the ET-Plus until informed of those changes by Mr. Harman in January 2012.

37.     Accordingly, Defendants are equitably estopped from relying on any statute of limitations or statutes of repose based on their fraudulent and intentional concealment.

38.     To recap, the changes in dimensions are:[6]

|  | **2000** | **Summer of 2005** |
|---|---|---|
| Exit  Gate inches | 1.2 to 1.5 inches | 1.0 inches |
| Feeder Channel Width inches | 5 inches | 4 inches |
| Feeder Chute Assembly Height a. exterior b. interior | 15 3/8 inchest 15 3/8 inches | 14 7/8 inches 14 3/8 inches |
| Feeder Chute Assembly Length | 37 inches | 36 ¼ inches |

39.     To date the ET-Plus continues to be sold in the United States, based on Trinity's representations that the ET-Plus is federally approved.   That representation is false.

40.     Harman has made a concerted effort to bring awareness to this issue to relevant public officials. Specifically, over the past year Harman has had numerous contacts with state and federal highway safety officials. Additionally, at the 2012 American Traffic Safety Services  Association's annual convention, Harman provided a summary presentation of the facts herein to  the state highway officials from New Hampshire, California, Florida, Oklahoma, North Carolina,  Pennsylvania, and Mississippi.

**TRINITY'S FALSE CERTIFICATIONS, CLAIMS AND RESULTING DAMAGES**

41.     On information and belief, every time Trinity sold the ET-Plus after the secret 2005 modifications, it necessarily provided a false certification that ET-Plus conformed to the unit that  had been approved by the FHWA. Those certifications—made to every state—were required for  the contractor-purchasers that would forward those certifications as part of their invoice in order  to be entitled to payment from state or federal authorities. For example, in the case of purchases  paid in the first instance by state authorities, the states would forward the certifications or provide

---

[6] As addressed, *supra*, there may be slight variations in the critical dimensions of the post-modification ET-  Plus units.

their own certifications that the roadside hardware was in compliance with or approved by the FHWA for reimbursement by the U.S. government.  Since 2005, thousands of dangerous and unapproved ET-Plus heads have been passed off by Trinity as approved by the FHWA and eligible for federal reimbursement to purchasers, state authorities and, ultimately, the Federal government.

42.     Without Trinity's false certifications, the purchasers, including Plaintiffs and all other counties in the State of Illinois, would not have purchased the ET-Plus heads, and state and federal governments would not have relied on those certifications and approved either payment or reimbursement for those ET-Plus heads.

43.     Indeed, on November 13, 2014, Plaintiff Macon County received a letter from the Illinois Department of Transportation ("IDOT") confirming that Trinity ET-Plus traffic barrier terminals would not be allowed on current or future contracts. (See Exhibit A).

44.     And while IDOT does not require that prior installed Trinity ET-Plus systems be removed, it does not deny that the systems are inherently defective or otherwise assure the county government bodies that they are safe for use on public highways.

45.     The above non-reconcilable positions, *i.e.,* you *cannot* install the ET-Plus on current or future projects because of the inherent defect contained within the modified system, but you *may keep* in place ET-Plus systems installed prior to October 23, 2014, puts each county and government body in an untenable position.

46.     IDOT has recognized that the ET-Plus system is too dangerous to allow its future use on Illinois highways, but has stopped short of demanding a statewide recall.

47.     Plaintiffs, who are accountable to and sworn to protect the best interests of their respective citizens, simply cannot sit back and wait to see what damage may be caused by Trinity's defective guardrails.

48.     But the cost to replace these systems, many of which were just recently installed,

creates a major obstacle to already cash-strapped county, township and municipal budgets.

## CLASS ACTION ALLEGATIONS

49.     Plaintiffs bring this action on behalf of themselves and, pursuant to Fed. R. Civ. P. 23, on behalf of all other counties of the State of Illinois, which were harmed by Defendants' wrongful and improper conduct alleged above (collectively referenced as the "Class").

50.     The Class is comprised of each of the 102 counties in the State of Illinois and joinder of each member as a party to this action is impracticable.

51.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as  would be used to prove those elements in an individual action.

52.     The Class claims present common questions of law or fact that predominate over any questions affecting only individual members of the proposed Class, including, but not limited to:

      a.    Whether Defendants violated the Uniform Deceptive Trade Practices Act when they failed to disclose and made material misrepresentations with regard to the modifications of the ET-Plus;

      b.    Whether Defendants were unjustly enriched after they received full compensation following the failure to disclose and material misrepresentations with regard to the modifications of the ET-Plus; and

      c.    Whether Plaintiffs are entitled to injunctive relief.

53.     The claims Plaintiffs assert herein are typical of the claims of each of the other Class members because, among other things, all Class members were comparably injured through the substantially uniform misconduct described above.  Plaintiffs are advancing the same claims

and legal theories on behalf of themselves and the other Class members and there are no defenses available to Defendants that are unique to Plaintiffs.

54.     Illinois law is applicable to all claims asserted by the Class.

55.     Plaintiffs are adequate representatives of the proposed Class because their interests do not conflict with the interests of other Class members they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs and their counsel will prosecute this action vigorously. The Class' interest will be fairly and adequately protected by Plaintiffs and their counsel.

56.     The action is maintainable as a class action because Defendants have acted on grounds generally applicable to the Class, thereby making final monetary, equitable and declaratory relief appropriate to the Class as a whole.

57.     Class action treatment here is superior to other methods for the fair and efficient resolution of this controversy because:

      a.     Separate adjudication of claims by individual Class members could lead to inconsistent results, which would establish incompatible standards of conduct for the Defendants;

      b.     Separate actions by individual Class members could injure other Class members' ability to adequately protect their interests;

      c.     The financial burden on individual Class members would make it impracticable for them to pursue their claims against Defendants individually; and

      d.     Judicial economy would be served by the maintenance of this action as a class action to avoid numerous individual lawsuits filed by Class members.

58.     No unusual difficulties are anticipated in the management of this case as a class action.

## CAUSES OF ACTION

### Count I

### Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose

59.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in Paragraph 1-58 above as though fully stated herein.

60.     At all times mentioned herein, Defendants manufactured and sold the ET Plus guard rail component, and prior to the time said product was purchased by Plaintiffs, Defendants impliedly warranted to Plaintiffs and to Plaintiffs' agents, that the product was of quality and fit for the use for which it was intended and the ordinary purpose for which such a product is used.

61.     Defendants are merchants that deal with goods on a regular basis that are of the same kind as those sold to Plaintiffs.

62.     Plaintiffs were a third-party beneficiary of the implied warranties of merchantability and fitness for a particular purposes because the manufacturer Defendants knew the identity, purpose, and requirements of Plaintiffs and members of the Class and manufactured and delivered those goods specifically to meet those requirements, which was to increase the safety of and protect those driving on the roads of the particular counties.

63.     The product was unfit for its intended use or ordinary use and it was not of merchantable quality, as warranted by Defendants, in that it had propensities to malfunction and fail to perform and protect when put to its intended and ordinary use. The aforesaid product caused Plaintiffs to sustain damages as herein alleged.

64.     The secretly redesigned ET Plus does not pass without objection in the normal course of business due to its propensity to malfunction.

65.     The Product was similarly unfit for its particular purpose. Defendants knew that Plaintiffs purchased the ET Plus in order to reduce fatalities and injuries to the occupants of vehicles on the roadway. Defendants secretly redesigned, manufactured, and sold a product that it knew, or should have known, would cause the guardrail to lock in the throat of the unit creating a hazard to the occupants of the vehicle and others, killing or maiming several individuals.

66.     Defendants designed, manufactured, sold and placed the product into the stream of commerce knowing and expecting that the product would be used by Plaintiffs and around members of the general public. Defendants knew, or should have known, that the product had a propensity to malfunction.

67.     Plaintiffs and Plaintiffs' agents relied on the skill and judgment of the Defendants in purchasing and using the aforesaid product.

68.     Defendants have failed to provide adequate remedy and caused its implied warranties to fail of their essential purpose, thereby permitting remedy under implied warranties.

69.     As a direct and proximate result of the breach of said warranties, Plaintiffs and the Class members have suffered and will continue to suffer loss as alleged herein in an amount to be determined at trial.

70.     Plaintiffs, on behalf of themselves and all other counties in the State of Illinois, demand judgment against Defendants for compensatory damages for themselves and each member of the Class, for the establishment of the common fund, plus attorney's fees, interest and costs.

### *Count II*

### *Violations of the Uniform Deceptive Trade Practices Act*

71.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in Paragraphs 1-70 above as though fully stated herein.

72.     At all times material hereto, there was in effect a statute known as the Uniform

Deceptive Trade Practices Act, which provides as follows:

> (a)     A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:
>
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;
>
> (7)  represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;
>
> (9) advertises goods or services with intent not to sell them as advertised;
>
> (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 515/2.

73.     Moreover, there was in effect a statute known as the Consumer Fraud and Deceptive Business Practices Act, which provides as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, **or the use or employment of any practice**

**described in Section 2 of the "Uniform Deceptive Trade Practices Act"**, approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/1 (emphasis added).

74. Plaintiffs are a "person" as defined in 815 ILCS 510/1(5).

75. Defendants' conduct occurred in the course of their business and in the conduct of trade or commerce.

76. Plaintiffs have suffered actual damages as an actual and proximate result of Defendants' intentional misrepresentation and concealment of material facts in violation of the statutes above as more fully set forth herein, which include, but are not limited to:

  a. Not disclosing the modifications to the ET-Plus pursuant to FHWA protocols;

  b. Not fully testing the ET-Plus in accordance with NCHRP 350;

  c. Did not comply with the requirements for a new or modified unit; and

  d. Shipping to customers ET-Plus units that were significantly different than the unit that received federal approval.

  e. Defendants' immoral and unscrupulous practices which were implemented so as to extract as much money as possible from Plaintiffs while at the same time reducing their manufacturing costs despite the knowing risk to the safety of the public at large.

21

77.     The actions of Defendants were done willfully, intentionally and with reckless disregard for harm that would be caused to Plaintiffs, and others similarly situated, and the public at large, and Defendants' conduct warrants imposition of exemplary damages to deter Defendants, and others in similar circumstances, from committing such actions in the future.

78.     Plaintiffs and the members of the Class are also entitled to recover attorneys' fees and costs, punitive damages, and injunctive relief as more fully set forth below.

### *Count III*

### *Unjust Enrichment*

**(Pleading in the Alternative, should there be no other adequate remedy at law)**

79.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in Paragraphs 1-79 above as though fully stated herein.

80.     By their wrongful acts and omissions as set forth herein, Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class as Defendants voluntarily accepted and the retention of the benefit would be inequitable and unjust.

81.     There is no justification for the wrongful conduct of Defendants as their actions sought only to reduce their manufacturing costs to the financial detriment of the Plaintiffs and also at the expense of the safety of the public at large.

82.     Plaintiffs seek restitution from Defendants and seek an order of this Court disgorging all profits, benefits and other compensation obtained by them from their wrongful conduct.

### *Count IV*

### *Injunctive Relief*

83.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in Paragraphs 1-83 above as though fully stated herein.

84.    Plaintiffs, individually, and on behalf of all the other Class members, seek a Court order requiring Defendants, jointly and severally, to replace all ET-Plus guardrail and guardrail components they designed, built, sold, and installed on the roadways of the Counties of the State of Illinois to comply with FHWA safety standards and design specifications.

WHEREFORE, Plaintiffs pray that this Court do the following:

a.    Certify the matter as a class action pursuant to Fed. R. Civ. P. 23;

b.    Grant injunctive relief requiring Defendants, jointly and severally, to replace all ET-Plus guardrail and guardrail components it designed, built, sold, and installed on the roadways of the Counties of the State of Illinois to comply with FHWA safety standards and design specifications.;

c.    Award Plaintiffs damages in an amount to be determined at trial;

d.    Award Plaintiffs their costs, prejudgment interest, and attorneys' fees; and

e.    Grant such other relief as is just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted:


By:  David Cates, #6289198,
Ryan J. Mahoney, #6290113
CATES MAHONEY, LLC
216 West Pointe Drive, Suite A
Swansea, IL  62226
Telephone:  618-277-3644
Facsimile:   618-277-7882
E-mail:   dated@cateslaw.com
E-mail:   rmahoney@cateslaw.com

/s/ Eric D. Holland
Eric D. Holland, # 6207110
R. Seth Crompton #6288095
HOLLAND  LAW FIRM
300 North Tucker, Suite 801
St. Louis, MO  63101
Telephone: 314-241-8111
Facsimile: 314-241-5554
E-mail: eholland@allfela.com
E-mail: scrompton@allfela.com

*/s/Christopher M. Ellis*
Christopher M. Ellis, ARDC No. 6274872
Shane M. Mendenhall, ARDC No. 6297182  BOLEN,
ROBINSON & ELLIS, LLP
202 South Franklin Street, 2nd Floor
Decatur, Illinois 62523
Telephone: 217-429-4296
Facsimile: 217-329-0034
E-mail: cellis@brelaw.com
E-mail: smendenhall@brelaw.com
***Special Assistant State's Attorneys  on Behalf  of the
Named Plaintiffs***


I hereby certify that on February 5, 2015, I electronically filed this First Amended Class Action Complaint on behalf of Plaintiffs with the Clerk of the Court using the CM/ECF system, which will send notification of such filing(s) to all parties of record.

/s/  David Cates